UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
ANNE MARIE GRECO, IAN SUTHERLAND,

Plaintiffs,

-against-

HUNTINGTON HOSPITAL, NORTHWELL HEALTH, INC.,

Defendants.
--------------------------------------------------------------------X

For Online Publication Only

FILED
CLERK
8/20/2026 11:19 am
U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**MEMORANDUM & ORDER**
22-cv-03992 (JMA) (SIL)

**AZRACK, United States District Judge:**

Pro se Plaintiffs Anne Marie Greco and Ian Sutherland assert claims against Defendants Huntington Hospital and Northwell Health, Inc. (ECF No. 1.) Plaintiffs' claims for medical malpractice (as to Greco) and negligent infliction of emotional distress (as to Sutherland) arise from treatment Greco received as a patient at Huntington Hospital between June 4 and June 13, 2019. (Id. at 5.) Before the Court is Defendants' motion for summary judgment.[1] (ECF No. 63 at 1–29.[2]) For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

### A. Relevant Facts

The following factual background is drawn from Plaintiffs' Complaint, (ECF No. 1), as well as Defendants' statement of material facts pursuant to Local Civil Rule 56.1, (ECF No. 63 at

[1] Defendants frame their motion as a motion for summary judgment on Greco's claim and a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(c) or 12(b)(6) on Sutherland's claim. However, because discovery has concluded on all claims, the Court construes the motion as a motion for summary judgment on all claims.

[2] Defendants filed two undifferentiated PDFs that together contain both sides' motion papers and supporting documents. For ease of reference, this opinion uses ECF-assigned page numbers in lieu of party-assigned page numbers.

38–50 ("Def. 56.1 Stmt.")), and the declaration with exhibits submitted by Defendants in support of the instant motion, (ECF No. 63 at 30–1225; ECF No. 63-1 at 1–541).[3]

Between June 4 and June 13, 2019, Greco was treated for neck and back pain at Huntington Hospital. (See ECF No. 1 at 5; Def. 56.1 Stmt.) As part of Greco's treatment, Huntington Hospital used hydromorphone—an opioid pain medication also known by the brand name Dilaudid. (ECF No. 1 at 6–7; Def. 56.1 Stmt. ¶¶ 10–13, 28–29, 94–96.) Greco claims that Huntington Hospital negligently failed to monitor her while she was being treated with hydromorphone and that, as a result of such negligence, she suffered from respiratory depression and hypoxia leading to permanent brain damage. (ECF No. 1 at 7–8.)

On June 4, 2019, Greco presented to the Emergency Department ("ED") at Huntington Hospital, complaining of tingling and numbness in her right arm and cervical pain. (Def. 56.1 Stmt. ¶ 6.) She reported a history of Ehlers-Danlos Syndrome ("EDS"),[4] a recent MRI that demonstrated a bulging disc in her neck, and a recent head trauma due to a fall. (Id. ¶¶ 7–8.) She also reported utilizing medical marijuana, unspecified narcotics, and muscle relaxants without any relief from the pain that brought her to the hospital. (Id. ¶ 8.) On examination, ED staff identified paraspinal muscle tenderness and a limited range of motion. (Id. ¶ 9.) ED staff administered 1 mg of Dilaudid, an opioid pain medication, via IV at 11:38 p.m. (Id. ¶¶ 10–11.) ED staff noted that Greco continued to experience pain, but a physical examination showed no acute findings. (Id. ¶ 12.) At 12:41 a.m. on June 5, Greco was administered 750 mg of Robaxin, a muscle relaxant, and at 1:21 a.m. an additional 1 mg of Dilaudid was administered. (Id. ¶ 13.) Greco was re-

[3] Because Plaintiffs failed to submit a counterstatement pursuant to Local Civil Rule 56.1(b), the Court deems the facts set forth in Defendants' Rule 56.1 Statement to be undisputed. See Local Civil Rule 56.1(c).

[4] Defendants explain that EDS is a congenital disorder affecting connective tissue. (ECF No. 63 at 11.) Plaintiffs allege that, during Greco's stay at Huntington Hospital, Defendants "rediagnosed" her from EDS to "factitious disorder . . . [which] is the modern name for what was formerly known as Munchhausen [sic] syndrome . . . [and] is where a patient fakes a medical condition." (ECF No. 1 at 6.)

assessed at 1:45 a.m. and was provided with 5 mg of Valium at 2:03 a.m. (Id. ¶ 14.) During all this time, Greco's blood pressure, heart rate, respiration rate, and oxygen saturation rate were all stable and within normal limits. (Id. ¶ 15.) At approximately 2:39 a.m. on June 5, Greco was discharged from the ED with instructions to follow up with her primary care physician within 24–48 hours. (Id. ¶ 16.)

Later on June 5, around 8:45 p.m., Greco returned to the ED complaining of lower extremity weakness earlier that day and a fall sustained approximately two hours prior, as well as right arm weakness, neck pain, and an inability to ambulate due to pain. (Id. ¶¶ 20–21.) She reported the same medical history described above, as well as a history of Post-Traumatic Stress Disorder ("PTSD") and panic attacks. (Id. ¶¶ 18, 22.) A physical examination revealed tenderness to the paracervical spine, without limitation of movement. (Id. ¶ 23.) Greco was provided with 0.25 mg of Xanax. (Id. ¶ 24.) An MRI of her cervical spine demonstrated a "mild curvature of the spine" but "no other pathology of concern and no bulging or protruding discs." (Id. ¶ 25.) Greco disputed the MRI's findings and reiterated her complaints of pain. (Id. ¶¶ 26–27.)

Early on June 6, Greco was admitted to Huntington Hospital for pain control regarding her neck and back pain. (Id. ¶ 29.) At 2:27 a.m., she was administered 0.5 mg of Dilaudid and reported positive effects. (Id. ¶¶ 28–29.) A physical examination found that Greco had a mildly tense right sided trapezius muscle with limited left-side range of motion. (Id. ¶ 33.) Greco reported utilizing medical marijuana, cyclobenzaprine (a muscle relaxer), and meloxicam (a NSAID) without relief from her pain, as well as Adderall and Paxil. (Id. ¶ 34.) Radiology results did not identify any possible source of Greco's pain, but hospital staff nevertheless devised a plan to monitor her complaints, administer pain control, and refer her to specialists for consultations. (Id. ¶¶ 35–36.)

That same day, Greco saw two specialists. First, a neurosurgeon, Alan Mechanic, M.D., examined Greco, who informed him that she had previously seen multiple neurologists who were

unable to determine a source of her pain. (Id. ¶ 38.) Dr. Mechanic reviewed Greco's MRI, which he described as "unremarkable," and performed a physical examination that revealed tenderness in Greco's trapezius muscle and sacrum midline. (Id. ¶ 41.) Dr. Mechanic recommended "a repeat MRI of the thoracic and lumbar spine, a neurology consultation, pain control, and consideration of a rheumatology consultation." (Id. ¶ 43.) This second MRI demonstrated "an incidental 1-2 mm syrinx, but was otherwise normal." (Id. ¶ 44.) Next, Greco saw a neurologist, Melissa Bernbaum, M.D., to whom she reported a history of concussion leading to memory loss, dizziness, and personality changes, as well as extreme, right-sided neck pain that radiated to her right arm, spine, and lower back. (Id. ¶¶ 45–48.) On physical examination, Dr. Bernbaum "noted Ms. Greco's pain was acute on chronic, without any clear cause." (Id. ¶ 48.) Dr. Bernbaum ordered an MRA of Greco's neck, as well as a trial of baclofen, physical therapy, and a trial of Nortriptyline after imaging. (Id. ¶ 49.) The MRA was reported as "without acute findings." (Id. ¶ 50.) Greco continued to make complaints of uncontrolled pain. (Id. ¶ 51.) "Both neurology and neurosurgery did not believe there were any findings on the MRI that could explain the source of Ms. Greco's complaints of pain – and indicated they were muscular in nature." (Id. ¶ 55.) Greco experienced relief after the administration of Dilaudid via IV. (Id. ¶ 48.) Greco was examined by a hospitalist and reported a headache and chronic neck pain scored 5/10 in severity. (Id. ¶ 59.) The physical examination was within normal limits, and the hospitalist said Greco could be treated with Baclofen as well as NSAIDs and Greco's own medical marijuana as needed. (Id. ¶¶ 60–62.)

On June 8, Greco continued to report neck pain, back pain, and pain in her knee and ankle, despite being treated with Dilaudid and Morphine. (Id. ¶¶ 64–66.) The neurology and neurosurgery departments both declined intervention, noting that there were no additional steps they could take, and the medical team planned to obtain a rheumatology consultation and continue Greco on Baclofen, Valium, and pain management medications. (Id. ¶¶ 69–70.) Around this time,

Greco requested transfer to a different hospital more familiar with EDS, which the medical team explored. (Id. ¶¶ 67–68.) That same day, Greco was evaluated by a psychiatric nurse practitioner, to whom she reported several prior psychiatric admissions and a significant psychiatric history of a suicidal attempt, chronic depression, anxiety, and PTSD. (Id. ¶¶ 71–74.) The psychiatric nurse practitioner diagnosed Greco with bipolar disorder in full remission, as well as "differential diagnoses of borderline personality disorder, factitious disorder, and somatic disorder." (Id. ¶ 76.) Next, a rheumatology consultation was attempted, but Greco "was unable to answer questions while writhing in pain." (Id. ¶ 79.)

On June 9, it was documented that Greco was "screaming and moaning about tremendous back pain," for which she was treated with Dilaudid. (Id. ¶ 81.) During that day, hospital staff documented that she was "exhibit[ing] erratic behavior: crying inconsolably, agitation, and other attention seeking behavior/acts." (Id. ¶ 83.) She was able to get out of bed on her own, and consulting physicians from Neurosurgery, Neurology, Psychiatry, and Rheumatology all agreed that "there was nothing on imaging to explain the degree of pain reported by Ms. Greco and she was not a candidate for surgical intervention." (Id. ¶ 86.) The plan was for her to engage in physical therapy and continue to take Bacloflen, NSAIDs, Valium, Notriptyline and other oral medications and patches to manage her pain so that she could be discharged and consult with an EDS specialist. (Id. ¶¶ 88–89.)

On June 10, Greco was screaming, complaining of back pain, which she scaled at a 10/10. (Id. ¶ 91.) She was administered pain medication and received an anesthesiology consultation and physical examination from Floyd J. Forbes, M.D. (Id. ¶¶ 91–92, 95.) Greco consented to explore a patient-controlled analgesia ("PCA") drip, "which would administer an initial bolus dose of 0.5 mg of Dilaudid, followed by an initial demand dose of 0.4 mg, a lockout of 6 minutes, a continuous rate of 0mg/hour, and a four-hour limit of 10 mg (meaning she would not receive more than 10 mg

over four hours)." (Id. ¶ 94.) Once the PCA was in use, Greco relayed that her pain was better managed. (Id. ¶ 96.)

On June 11, a CRNA/anesthesiologist noted that "the PCA was in use, that Greco was comfortable, and she rated her pain as 4/10." (Id. ¶ 98.) Staff continued to attempt to secure a transfer to a different hospital, per Greco's requests. (Id. ¶¶ 97, 101.) A hospitalist, Dr. D'Amico, examined Greco and noted that she was comfortable and that the examination was within normal limits. (Id. ¶¶ 102–03.) Staff planned to discontinue the PCA in the morning of June 12 and start oral opioid therapy, with the goal of discharging Greco to follow up with her pain management physician and osteopathic specialist. (Id. ¶¶ 88–89.)

At 4:47 a.m. on June 13, Greco told a nurse, Jian Min Guan, R.N., that she had experienced a seizure and involuntary muscle twitching. (Id. ¶ 105.) At this time, Greco was able to speak clearly and move her extremities well and her oxygen saturation rates were between 97% and 100% on room air. (Id. ¶¶ 105–06.) A hospitalist performed a physical examination and, noting no muscle twitching, determined that she was not a candidate for ICU care and that she had likely not experienced a seizure. (Id. ¶¶ 109–10.) Later that morning, Greco was alert and oriented, able to speak clearly, and was "screaming and cursing at hospital staff, punching and kicking her bed, [and] being combative[.]" (Id. ¶ 111–12.) Sutherland and Greco called the police in an attempt to force a transfer to a different hospital, however, there was no receiving physician or facility who would accept her transfer. (Id. ¶¶ 113–14.) After discussion with Greco, it was determined that she was medically stable and could be discharged with a plan to seek further outpatient care. (Id. ¶ 115.) The PCA was discontinued, Greco's vital signs were stable, and she was discharged to home with a wheelchair and cane and instructions to follow up with a geneticist and primary care physician. (Id. ¶¶ 116–19.)

On July 6, 2019, an MRI of Greco's brain was performed at Zwanger Pesiri Radiology and interpreted by Eliyahu Englesohn, M.D., who determined that it was a "Normal MRI of the brain" with no acute findings. (Id. ¶¶ 120–23.)

On January 29, 2022, a CT scan of Greco's head was performed at Ferry County Public Hospital in Washington and interpreted by Richard Brunkan, M.D., who determined that it was an "unremarkable CT of the head." (Id. ¶¶ 124–26.)

The Complaint alleges that Defendants' treatment of Ms. Greco was negligent because Defendants "began using hydromorphone in their treatment of [Greco] while she was Opioid-Naïve," that they used inappropriately high starting doses, and that they "did not use adequate monitoring for an opioid-naïve patient on hydromorphone in the doses used." (ECF No. 1 at 6–7.) Plaintiffs assert that, as a result of Defendants' alleged negligence, Ms. Greco suffered from respiratory depression, brain hypoxia, and brain damage. (Id. at 7–8.) Additionally, the Complaint alleges that Sutherland developed PTSD after witnessing Defendants' treatment of Ms. Greco, causing him to experience professional setbacks. (Id. at 10.) No evidence in the record pertains to Sutherland's allegations.

**B. Procedural History**

On July 7, 2022, Plaintiffs initiated this action by filing the Complaint. (ECF No. 1.) Liberally construed, the Complaint asserts two causes of action. First, the Complaint asserts that Defendants committed medical malpractice by negligently treating Greco with opioids, causing her to suffer permanent brain damage. (Id. at 7–8.) Second, the Complaint asserts that Defendants' treatment of Greco caused Sutherland to develop PTSD, (id. at 10), which the Court construes as an assertion that Defendants are liable to Sutherland for negligent infliction of emotional distress.[5]

[5] Defendants' motion for summary judgment likewise treats Sutherland's claim as one for negligent infliction of emotional distress. (See ECF No. 63 at 22.)

Plaintiffs did not file a proposed summons or serve Defendants within 90 days, as is required by Federal Rule of Civil Procedure 4(m). On August 31, 2022, the Court issued an order warning Plaintiffs that the action would be dismissed if they failed to serve Defendants by October 5, 2022. (See Elec. Order dated August 31, 2022.) Plaintiffs did not comply with the August 31 Order. Instead, on October 7, 2022, Plaintiffs requested two additional months to effect service of the complaint. (See ECF No. 11.) Magistrate Judge Shields granted an extension until November 7, 2022. (See Elec. Order dated Oct. 17, 2022.) Plaintiffs did not comply with Judge Shields's Order. On November 22, 2022, this Court issued a final warning to Plaintiffs that if they did not serve Defendants by December 22, 2022, the Complaint would be dismissed without prejudice. (See Elec. Order dated Nov. 22, 2022.) Plaintiffs did not comply with the November 22 Order. On December 27, 2022, the undersigned dismissed the Complaint without prejudice due to Plaintiffs' failure to file proof of service or show good cause for their failure to effect service. (See Elec. Order dated Dec. 27, 2022.) However, on January 6, 2023, the Court reopened the case and granted Plaintiffs a final opportunity to effect service on Defendants in accordance with Rule 4. (See Elec. Order dated Jan. 6, 2023.) In each of its Orders, the Court advised Plaintiffs to seek the advice of the Hofstra Law Pro Se Legal Assistance Program.

Plaintiffs finally served Defendants on January 24, 2023, (ECF No. 15), and appeared before Magistrate Judge Locke for an initial conference on March 30, 2023, (ECF No. 26). Fact discovery concluded on May 21, 2024. (ECF No. 49.)

On July 8, 2024, the parties appeared for a status conference before Judge Locke regarding expert witness discovery. (ECF No. 53; see also ECF No. 59 ("July 8 Tr.").) At that conference, Judge Locke asked Plaintiffs whether they planned to retain an expert witness. (July 8 Tr. at 2:14–17.) Judge Locke warned Plaintiffs that Sutherland was unlikely to qualify as an expert witness. (Id. at 3:2–8.) Plaintiffs nevertheless confirmed to Judge Locke that they did not intend to retain

an expert. (See id. at 3:10–15.) Counsel for Defendants also denied an intention to retain an expert witness. (See id. at 3:18–4:2.) Accordingly, Judge Locke announced that discovery was closed and that the parties could proceed with dispositive motion practice. (Id. at 3:25–4:2.)

On August 8, 2024, Defendants filed a pre-motion conference letter seeking leave to file the instant motion for summary judgment. (ECF No. 55.) In their letter, Defendants stated that they intended to move for summary judgment based on Plaintiffs' failure to present expert testimony. (Id.) In response, Plaintiffs argued that "Ian Sutherland is a licensed medical professional, and therefore qualified to be an expert witness in this case" and that "nothing in the federal rules of civil procedure indicate that not hiring an expert witness may be cause for dismissal of a case[.]" (ECF No. 57.) Plaintiffs' letter continued: "With the ease of availability of official US government guidelines, medical literature, and association recommendations, I find it preposterous that one would require expert evidence to demonstrate that which can be plainly seen by reading the record and said publicly available recommendations." (Id.)

On March 7, 2025, Defendants served the instant motion for summary judgment on Plaintiffs. (ECF No. 63 at 4.) Defendants attached to their motion a declaration with exhibits, including two expert medical reports. (ECF No. 63 at 30–32, Exs. A, B.) Defendants simultaneously provided notice to Plaintiffs pursuant to Local Rule 56.2 that the Complaint may be dismissed without trial if Plaintiffs did not respond to the motion by submitting "sworn affidavits and other papers as required by Rule 56(e)." (ECF No. 63 at 34–35.) Pursuant to the parties' jointly proposed briefing schedule, Plaintiffs' opposition brief was initially due on July 7, 2025. (ECF No. 58.) However, on June 30, 2025, Plaintiffs requested a two-month extension, arguing, inter alia, that they needed time and opportunity to depose Defendants' expert witnesses. (ECF No. 61.) The Court promptly granted the extension, which allowed Plaintiffs a total of six months to craft their opposition to the instant motion. (Elec. Order dated June 30, 2025). There

is no indication in the record that Plaintiffs deposed Defendants' experts, or even sought to depose them, during that time.[6] Plaintiffs did not request any further extensions and served their opposition brief on September 3, 2025. (ECF No. 63-1 at 543–47.) Plaintiffs did not submit any sworn affidavits or any other evidence in support of their opposition to the summary judgment motion, despite being on notice that Rule 56 requires them to do so. (See ECF No. 63 at 34–35.) On October 10, 2025, Defendants served their Reply and electronically filed the fully briefed motion. (ECF Nos. 63, 63-1.)

## II. LEGAL STANDARD

Under Rule 56, a moving party is entitled to summary judgment if he or she "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." Choi v. Tower Research Capital LLC, 2 F.4th 10, 16 (2d Cir. 2021); see also McKinney v. City of Middletown, 49 F.4th 730, 737 (2d Cir. 2022) ("No genuine dispute of material fact exists when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.") (internal quotation marks omitted). The Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." ING Bank N.V. v. M/V Temara, 892 F.3d 511, 518 (2d Cir. 2018).

Generally, "[t]he moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." Jaffer v. Hirji, 887 F.3d 111, 114 (2d Cir. 2018) (internal quotation marks omitted). "However, when the burden of proof at trial would fall on the non-moving party,

---

[6] Indeed, in their opposition brief, Plaintiffs maintain that they "were denied any opportunity to depose these witnesses[.]" (ECF No. 63-1 at 545.)

the moving party may meet its burden by 'point[ing] to a lack of evidence . . . on an essential element' of the non-moving party's claim." Potter v. United States, No. 17-cv-4141, 2020 WL 2836440, at *2 (S.D.N.Y. May 30, 2020) (quoting Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199, 204 (2d Cir. 2009)). Once the moving party carries its burden, "the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." McKinney, 49 F.4th at 738 (internal quotation marks omitted).

"Although district courts must liberally construe pro se filings, particularly in the summary judgment context, that liberal construction does not alter the applicable evidentiary burdens." Minto v. Molloy Univ., 715 F. Supp. 3d 422, 430 (E.D.N.Y. 2024) (cleaned up) (citing Jackson v. Fed. Express, 766 F.3d 189, 195 (2d Cir. 2014); Vasquez v. Warren, 630 F. Supp. 3d 524, 535 (S.D.N.Y. 2022)).

## III. DISCUSSION

### A. Medical Malpractice

"To establish a claim for medical malpractice under New York law, a plaintiff must prove (1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused the plaintiff's injuries." Arkin v. Gittleson, 32 F.3d 658, 664 (2d Cir. 1994). "[E]xpert testimony is generally necessary to 'establish the applicable standard of practice and, in an appropriate case, to determine whether an alleged deviation from that standard was the proximate cause of a plaintiff's injuries.'" Potter, 2020 WL 2836440, at *3 (quoting Alford v. United States, No. 17-cv-5217, 2020 WL 376749, at *14 (S.D.N.Y. Jan. 23, 2020)). Thus, to survive summary judgment, "unless the alleged act of malpractice falls within the competence of a lay jury to evaluate, it is incumbent upon the plaintiff to present expert testimony in support of the allegations[.]" Sitts v. United States, 811 F.2d 736, 739, 742 (2d Cir. 1987); see also Einaugler v. Supreme Ct. of State of N.Y., 109 F.3d 836, 841 (2d Cir. 1997) ("New York civil tort actions

for medical malpractice in New York cannot get to a jury without such expert evidence[.]"); Potter, 2020 WL 2836440, at *8 (granting summary judgment to defendants because medical malpractice plaintiff failed to provide admissible expert evidence on causation).

As explained above, Greco's malpractice claim consists of allegations that she was "opioid-naïve" at the time she was admitted to Huntington Hospital; that use of high doses of hydromorphone in opioid-naïve patients is "known to cause fatal respiratory depression"; that Defendants failed to sufficiently monitor Greco's breathing or oxygen levels while treating her with Dilaudid; and that, as a result of such negligence, Greco suffered from respiratory depression and hypoxia, leading to brain damage and an ongoing need for expensive home health care. (See ECF No. 1 at 6–8.)

Plaintiffs offer no evidence of any kind, let alone the required expert testimony, to support these allegations. Plaintiffs were on notice that they would be required to submit such evidence to survive summary judgment. (See ECF No. 63 at 34–35.) Plaintiffs argue that Defendants' negligence is sufficiently established by Defendants' alleged failure to follow publicly available federal guidance regarding the proper procedures for monitoring patients on PCA opioids. (See ECF No. 63-1 at 545.) However, Plaintiffs have not even submitted the purportedly applicable federal guidance for the Court's review, nor do they point to any evidence in the record that establishes Defendants' alleged violations of those guidelines. Moreover, this is not the "rare" medical malpractice action in which expert testimony is unnecessary to establish defendants' negligence, such as "where the surgeon saws off the wrong leg, or there is injury to a part of the body not within the operative field." Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser and Keeton on the Law of Torts § 32, at 189 (5th ed. 1984) (quoted in Sitts, 811 F.2d at 740). Moreover, expert testimony is also necessary to prove that Defendants' alleged negligence was the proximate cause of Greco's alleged injury. See Sitts, 811 F.2d at 740.

Plaintiffs have thus failed to demonstrate the existence of a triable issue of fact and summary judgment must therefore be granted in favor of Defendants. See Potter, 2020 WL 2836440, at *8 ("If a plaintiff cannot establish a prima facie case without the benefit of expert testimony, and the plaintiff is unable to procure such testimony, then summary judgment is appropriate."); John-Cedeno v. New York City Health + Hosps. Corp., No. 22-cv-7959, 2025 WL 2432047, at *4 (E.D.N.Y. Aug. 22, 2025) (granting summary judgment in favor of defendants because plaintiff failed to produce "some statement of expert medical opinion"); Shields v. United States, 446 F. App'x 325, 326 (2d Cir. 2011) (affirming district court's dismissal of pro se plaintiff's medical malpractice claim where plaintiff failed to present expert medical testimony).

Although it is not necessary to the Court's resolution of the instant motion, the Court draws additional support from the evidence presented by Defendants that their treatment of Greco was well within the applicable standard of care. In support of their motion, Defendants submitted declarations and expert reports of two medical experts: Dr. Christopher Gharibo, (ECF No. 63 at

55–96), and Dr. Edward Eden, (id. at 98–121).[7] Dr. Gharibo currently serves as the Medical Director of Pain Medicine in the Department of Anesthesiology, Perioperative Care and Pain Medicine at NYU Langone Health. (Id. at 55.) In his thirty years of practice in anesthesiology and pain management, he has treated "thousands of patients with primary complaints of back and neck pain, as well as other complaints similar to Ms. Greco['s]." (Id. at 57.) He attests "to a reasonable degree of medical certainty that the care and treatment provided to Ms. Greco was at all times in accordance with good and accepted standards of medical practice and none of the alleged injuries were caused by any actions or inactions of the defendants." (Id. at 56.) Based on his review of Greco's medical records, Dr. Gharibo concludes that "Ms. Greco was provided appropriate pain management and there is no evidence that she received an improper dose of narcotic medications." (Id.) Dr. Eden currently serves as the Director of the Pulmonary Function

---

[7] Plaintiffs contend that Defendants' expert witness reports must be struck as untimely because they were not disclosed until February 3, 2025, almost seven months after discovery closed on July 8, 2024. (See ECF No. 63-1 at 545–46.) Plaintiffs further argue that Defendants' expert reports must be struck because neither expert disclosed a list of all cases in the last 4 years in which they have provided expert testimony and neither declared the compensation he received in the instant case, as is required by Federal Rule of Civil Procedure 26(c)(2)(B). (See id.)

Under Federal Rule of Civil Procedure 37(c)(1), a district court may strike an expert report that was not appropriately disclosed "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); see also Lorme v. Delta Air Lines, Inc., 251 F. App'x 691, 692 (2d Cir. 2007) (explaining that, under Rule 37, a "trial judge has broad discretion in the matter of the admission or exclusion of expert evidence") (quoting Salem v. United States Lines Co., 370 U.S. 31, 35 (1962)).

Here, Defendants provided no justification for their failure to comply with Rule 26. However, the Court concludes that these failures were harmless in this case for two reasons. First, as explained supra, Plaintiffs failed to meet their burden of proof under New York law, which requires them to put forth expert testimony that establishes their claim for medical malpractice or face dismissal at summary judgment. Plaintiffs were on notice that the Court could dismiss the Complaint if they did not respond to Defendants' motion with evidence supporting their allegations, (see ECF No. 63 at 34–35), yet they put forth no evidence of any kind. Therefore, it is not necessary for the Court to rely on Defendants' expert reports. Defendants are entitled to summary judgment even if the Court were to exclude these reports. Second, Defendants provided both expert reports to Plaintiffs over a month before Defendants served the instant motion and a full seven months before Plaintiffs' deadline to oppose. The Court granted Plaintiffs an extension of their deadline to oppose this motion based in part on Plaintiffs' assertion that they needed time to depose Defendants' experts. (See ECF No. 61.) However, nothing in the record suggests that Plaintiffs ever attempted to depose Defendants' experts or considered retaining rebuttal experts, even though they had ample time to do so. Plaintiffs did not request any further extensions or make any further appeals to the Court regarding expert discovery. As such, the Court declines to credit Plaintiffs' assertion that they "were denied any opportunity to depose these witnesses, retain rebuttal experts, or test the reliability of their opinions." (See ECF No. 63-1 at 545.) Accordingly, Defendants' violation of Rule 26 is harmless here. The Court can consider Defendants' expert reports, which further support the Court's determination that Defendants are entitled to summary judgment.

Plaintiffs do not otherwise challenge the reliability or qualifications of Defendants' medical experts. Accordingly, the Court assumes, without deciding, that both experts are qualified.

Laboratory, the Medical Director for Respiratory Therapy, and the Medical Director of the Pulmonary Rehabilitation Program at Mt. Sinai, St. Luke's, and Mt. Sinai West hospitals. (Id. at 98.) Based on his review of the record, Dr. Eden attests "within a reasonable degree of medical certainty that at no point during her Huntington Hospital admission did Ms. Greco suffer from tachypnea, bradypnea, or an otherwise abnormal respiratory rate," nor did she "experience a depression of her respiratory effort or respiratory distress." (Id. at 99.) He also notes that there is "no evidence within the records of Huntington Hospital or subsequent providers that Ms. Greco sustained a hypoxic brain injury[.]" (Id. at 100.) These experts' conclusions—combined with Plaintiffs' failure to provide contrary expert testimony—further bolster the Court's decision to dismiss Greco's malpractice claim.

Accordingly, Defendants are entitled to summary judgment with respect to Greco's malpractice claim.

**B. Negligent Infliction of Emotional Distress**

The only allegations in the Complaint that pertain to Sutherland are that he "developed PTSD while [Greco] was in [Defendants'] care" and that has suffered professional setbacks due to the PTSD. (ECF No. 1 at 10.) Plaintiffs' opposition to the instant motion states that Sutherland developed PTSD "directly caused by Defendants' conduct toward Ms. Greco . . . which Mr. Sutherland personally witnessed." (ECF No. 63-1 at 544.) Neither the Complaint nor Plaintiffs' opposition identifies a cause of action for Sutherland's claim. However, because Plaintiffs are proceeding pro se, the Court liberally construes the Complaint as asserting a claim for negligent infliction of emotional distress.[8]

New York courts are generally "reluctant to hold a medical provider liable to the patient's family for emotional distress as a result of malpractice in treating the patient." Shaw v. QC-Medi

[8] Defendants construe Sutherland's claim in the same way. (See ECF No. 63 at 22.)

New York, Inc., 10 A.D.3d 120, 123 (N.Y. App. Div. 2004). However, a plaintiff may establish such a claim for negligent infliction of emotional distress in one of two ways: the "bystander" theory, or the "direct duty" theory. Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). Under the "bystander theory," a plaintiff must establish that: "(1) she is threatened with physical harm as a result of defendant's negligence; and (2) consequently she suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family." Id. Under the "direct duty" theory, a plaintiff must have "suffer[ed] an emotional injury from defendant's breach of a duty which unreasonably endangered her own physical safety." Id. "The duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." Id.

Sutherland has failed to state a claim under either theory. He does not allege that his physical safety was ever threatened because of Defendants' conduct. He also has not alleged that Defendants owed any duty specific to him, nor does the record support a finding of any such duty, as he was never a patient in Defendants' care. For these reasons, Sutherland has failed to state a claim of negligent infliction of emotional distress. And he certainly has not pointed to any evidence that would allow him to survive summary judgment on such a claim. Moreover, any negligent infliction of emotional distress claim is premised on Defendants' purported medical malpractice concerning Greco, which fails for reasons explained above. Accordingly, Defendants are entitled to summary judgment on Sutherland's negligent infliction of emotional distress claim.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: August 20, 2026
Central Islip, New York

/s/ JMA
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE